UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | CRIMINAL NO. |
| | : | |
| | : | VIOLATIONS:  18 U.S.C. § 286, 1341, 2, |
| | : | 981, 28 U.S.C. § 2461 |
| v. | : | (Conspiracy to Defraud the Government |
| | : | With Respect to Claims, Mail Fraud, |
| | : | Causing an Act to Be Done, Forfeiture) |
| DAVID VILLONGCO, | : | |
| | : | <u>UNDER SEAL</u> |
| Defendant. | : | |

INFORMATION

The United States Attorney and the United States Department of Justice, Criminal Division, Fraud Section charge that at all times material to this Information:

INTRODUCTION

1.   DAVID VILLONGCO ("VILLONGCO") was co-owner and General Manager of PBJ Venture International Corporation ("PBJ Ventures"), an exporting company located in San Mateo, California that was in the business of purchasing United States goods on behalf of clients in the Philippines and shipping those goods overseas.  From in or about October 2001 until August 2004, VILLONGCO and a co-conspirator ("CC-1"), through PBJ Ventures, acted as purported "exporters" in approximately $20 million worth of fraudulent loan transactions, falsified documents sent to United States banks and to the Export-Import Bank of the United States ("Ex-Im Bank"), and misappropriated approximately $16 million in loan proceeds.

2.   Co-Conspirator 2 ("CC-2") was a loan broker living in Manila, Philippines.  From in or about October 2001 until July 2004, CC-2 brokered approximately $20 million in fraudulent loan transactions in which VILLONGCO and CC-1 acted as exporters.  As a loan

broker, CC-2 would identify purported borrowers in the Philippines and lending banks in the United States and then assist borrowers in executing loan agreements with the banks and the Ex-Im Bank. Once the loans were finalized, CC-2 instructed VILLONGCO and CC-1 to prepare false loan documents, submit the false loan documents to the lending banks and to the Ex-Im Bank, and then misappropriate the loan proceeds.

   3.  The Ex-Im Bank was an independent agency of the executive branch of the United States and located in Washington, D.C. It was also the official export credit agency of the United States. The mission of Ex-Im Bank was to assist in the export of United States goods and services to companies overseas. One of the ways Ex-Im Bank fulfilled this mission was by issuing loan guarantees to United States banks on behalf of creditworthy foreign companies for the purpose of purchasing United States goods. Once Ex-Im Bank issued a loan guarantee, if the foreign borrower defaulted on its loan repayments to a United States bank, the Ex-Im Bank paid the amount of the outstanding loan to the United States bank. Before issuing a loan guarantee, Ex-Im Bank required that a United States exporter - the person or entity shipping the United States goods on behalf of the foreign borrower - certify to Ex-Im Bank the type, amount, and value of the United States goods that it would be shipping and that the goods shipped were made in the United States.

   4.  Relying on information provided by VILLONGCO, CC-1, and others, Ex-Im Bank provided lending banks with approximately $16 million in loan guarantees, promising that the Ex-Im Bank would reimburse the banks for any losses it incurred in the fraudulent loan transactions. As a result of defaults affiliated with the fraudulent VILLONGCO and CC-1 loan

transactions, the Ex-Im Bank has paid approximately $9.2 million in claims to the lending banks.

**COUNT ONE**
**(CONSPIRACY TO DEFRAUD THE GOVERNMENT WITH RESPECT TO CLAIMS)**

THE CONSPIRACY

5.     From in or about October 2001 until August 2004, in the District of Columbia and elsewhere, VILLONGCO, CC-1, CC-2, and others did unlawfully and knowingly agree, combine and conspire together and with each other to defraud an agency of the United States by obtaining and aiding to obtain the payment and allowance of false, fictitious and fraudulent claims, that is: to agree, combine and conspire together and with each other to defraud the Ex-Im Bank, an agency of the United States, by obtaining and aiding to obtain the payment and allowance of false, fictitious and fraudulent claims.

A Goal of the Conspiracy

6.     A goal of the conspiracy was for the co-conspirators, including VILLONGCO and CC-1, to unlawfully enrich themselves by submitting false and fraudulent information to the Ex-Im Bank through the lending banks to obtain and misappropriate the loan proceeds.

Manner and Means of the Conspiracy

7.     To achieve the goal of the conspiracy, VILLONGCO, CC-1, CC-2, and others used the following manners and means, among others:

     A.     CC-2 identified purported borrowers in the Philippines and lending banks in the United States and assisted Philippine borrowers in executing loan agreements with the lending banks and the Ex-Im Bank;

     B.     CC-2 instructed VILLONGCO and CC-1 to prepare false documents that would be submitted to the lending banks and the Ex-Im Bank to facilitate the fraudulent loan transactions;

  C. VILLONGCO and CC-1 prepared false documents indicating that United States goods would be purchased and shipped to the Philippine companies and then submitted those documents to Ex-Im Bank, through the lending banks; and

  D. VILLONGCO and CC-1 received the proceeds of the bank loans, distributed a portion of that money amongst themselves for their own personal benefit and use, then transferred millions of dollars of proceeds to foreign bank accounts owned and controlled by CC-2.

## Overt Acts

  8 Within the District of Columbia and elsewhere, in furtherance of the above described conspiracy and in order to carry out the objects thereof, VILLONGCO, CC-1, CC-2, and others known and unknown, committed the following overt acts, among others:

  A. In or about October 2001, CC-1 met with CC-2 and agreed that CC-1 and VILLONGCO, through PBJ Ventures, would act as "exporters" in loan transactions brokered by CC-2 between Philippine borrowers and United States lending banks, in which the Ex-Im Bank was guaranteeing the loans.  CC-2 agreed to pay PBJ Ventures a fee of 1.5-2.5% of the value of the purported goods to be shipped, depending upon the value of the goods.

  B. In or about October 2001, CC-2 and CC-1 instructed VILLONGCO that lending banks would not pay loan proceeds to PBJ Ventures until the banks and the Ex-Im Bank received a Commercial Invoice, Packing List, Bills of Lading, and Ex-Im Bank Supplier's Certificate (collectively "shipping documents") documenting the amount and value of United States goods shipped to the Philippines.

  C. From in or about December 2001 until July 2004, VILLONGCO and

4

CC-1 prepared false Commercial Invoices, Packing Lists, and Bills of Lading documenting approximately $20 million worth of inventory that they had purportedly purchased and shipped to the Philippine borrowers.

      D.      From in or about December 2001 until July 2004, VILLONGCO and CC-1 prepared false Ex-Im Bank Supplier's Certificates certifying that they had purchased and shipped approximately $20 million worth of United States goods to the Philippine borrowers.

      E.      From in or about December 2001 until July 2004, VILLONGCO and CC-1 sent to Ex-Im Bank, through the lending banks, the Commercial Invoices, Packing Lists, Bills of Lading, and Ex-Im Bank Supplier's Certificates that they prepared, as proof that they had purchased and shipped approximately $20 million worth of United States goods to the Philippine borrowers.

      F.      From in or about December 2001 until August 2004, PBJ Ventures received approximately $16 million in loan proceeds from the lending banks. Rather than using the loan proceeds to purchase United States goods, VILLONGCO and CC-1 each kept approximately $150,000 of the loan proceeds and transferred approximately $15.5 million to foreign bank accounts owned or controlled by CC-2.

**(Conspiracy to Defraud the Government with Respect to Claims, in violation of Title 18, United States Code, Section 286)**

### COUNT TWO
### (MAIL FRAUD)

9.  Paragraphs 1 through 4 and 8 of this Information are realleged and incorporated by reference as if set out in full.

10. From in or about December 2001 until August 2004, in the District of Columbia and elsewhere, VILLONGCO and CC-1, along with others known and unknown, did knowingly devise and intend to devise a scheme and artifice to defraud the Ex-Im Bank and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and for the purpose of executing such scheme used Federal Express, a commercial interstate carrier.

11. On or about July 21, 2004, VILLONGCO and CC-1, along with others known and unknown, for the purpose of executing the scheme and artifice to defraud, did knowingly cause to be delivered through Federal Express, a commercial interstate carrier, an Ex-Im Bank Supplier's Certificate to Toronto-Dominion Bank, knowing that it would be forwarded to the Ex-Im Bank.

**(Mail Fraud, Causing an Act to be Done, in violation of Title 18, United States Code, Sections 1341 and 2)**

### FORFEITURE

12  As a result of the mail fraud offense alleged in Count Two of the Information, which is realleged and incorporated by reference for the purpose of alleging forfeitures to the United States of America pursuant to Title 18, United States Code, Section 981, and Title 28, United States Code, Section 2461(c), defendant VILLONGCO shall, upon conviction of such offense alleged in the Information, forfeit to the United States all property, real and personal, which constitutes or is derived from proceeds traceable to the mail fraud offense, wherever located, and in whatever name held, including, but not limited to a sum of money equal to the

6

amount of proceeds obtained as a result of the mail fraud in violation of Title 18, United States Code, Section 1341.  By virtue of the offense charged in Count Two of the Information, any and all interest that the defendant has in the property constituting, or derived from, proceeds obtained directly or indirectly, as a result of such offenses is vested in the United States and hereby forfeited to the United States pursuant to Title 18, United States Code, Section 981, in conjunction with Title 28, United States Code, Section 2461(c).

13.     In the event that any property described above as being subject to forfeiture, as a result of any act or omission by the defendant:

(a)  cannot be located upon the exercise of due diligence;

(b)  has been transferred or sold to or deposited with a third person;

(c)  has been placed beyond the jurisdiction of the Court;

(d)  has been substantially diminished in value; or

(e)  has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 981 and Title 28, United States Code, Section 2461, to seek forfeiture of any other property of VILLONGCO up to the value of the above described property in paragraph 13(a)-(e).

**(Forfeiture, Title 18, United States Code, Section 981, Title 28, United States Code, Section 2461)**

          JEFFREY A. TAYLOR
          United States Attorney
          In and For the District of Columbia

By: _____
          MICHAEL K. ATKINSON
          D.C. Bar # 430517
          Assistant United States Attorney
          Fraud and Public Corruption Section
          555 4th Street, N.W.
          Washington, D.C. 20530
          (202) 616-3702


          STEVEN A. TYRRELL
          Acting Chief, Fraud Section
          Criminal Division
          United States Department of Justice

By: _____
          HANK BOND WALTHER
          D.C. Bar # 477218
          Trial Attorney
          Fraud Section, Criminal Division
          United States Department of Justice
          1400 New York Avenue, NW
          Washington, D.C. 20005
          (202) 257-6176


Date: January 5, 2007